EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Nelson Rosario Rodríguez, en su capacidad oficial como Comisionado Electoral del Partido Proyecto Dignidad<br><br>Recurrido<br><br>v.<br><br>Ricardo A. Rosselló Nevares<br><br>Recurrido<br><br><br>Gerardo Cruz Maldonado, en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD)<br><br>Peticionario<br><br>Hon. Francisco Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones;<br>Roberto Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño (PIP);<br>Olvin Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Partido Movimiento Victoria Ciudadana (MVC);<br>Vanessa Santo Domingo, en su capacidad oficial como Comisionada Electoral del Partido Nuevo Progresista (PNP) | CC-2021-0459<br>Cons. con<br>CC-2021-473 | Certiorari<br><br>2021 TSPR 107<br><br>207 DPR ____ |

Recurridos

_____

Nelson Rosario Rodríguez, en su carácter oficial de Comisionado Electoral del Partido Proyecto Dignidad

Peticionario

v.

Ricardo A. Rosselló Nevares

Recurrido

Hon. Francisco Rosado Colomer, en su carácter de Presidente de la Comisión Estatal de Elecciones; Roberto Aponte Berríos, en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); Olvin Valentín Rivera, en su carácter de Comisionado Electoral del Partido Movimiento de Victoria Ciudadana (MVC); Gerardo Cruz Maldonado, en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); Vanessa Santo Domingo, en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP)

Recurridos

Número del Caso:    CC-2021-459
              Cons. CC-2021-473

Fecha: 20 de julio de 2021

Tribunal de Apelaciones:

    Panel X

**CC-2021-459**

Abogados de la Parte Peticionaria:

    Lcdo. Jorge Martínez Luciano
    Lcdo. Emil Rodríguez Escudero

**CC-2021-473**

Abogado de la Parte Peticionaria:

    Lcdo. Nelson Rosario Rodríguez

Abogado de la parte Recurrida:

    Lcdo. Juan Manuel Mercado Nieves

Materia: Resolución con Voto particular disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Integración de Sala Especial |
| --- |

RESOLUCIÓN

En San Juan, Puerto Rico, a 19 de julio de 2021.

Por estar igualmente dividido los miembros de esta sala, se constituye una Sala Especial de Verano integrada por la Jueza Presidenta Oronoz Rodríguez, la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Rivera García, el Juez Asociado señor Feliberti Cintrón y el Juez Asociado señor Estrella Martínez, para atender el caso CC-2021-459 consolidado con CC-2021-473, Nelson Rosario Rodríguez, en su capacidad oficial como Comisionado Electoral del Partido Proyecto Dignidad v. Ricardo A. Rosselló Nevares; Gerardo Cruz Maldonado, en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); Hon. Francisco Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones; Roberto Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); Olvin Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Partido Movimiento Victoria Ciudadana (MVC); Vanessa Santo Domingo, en su capacidad oficial como Comisionada Electoral del Partido Nuevo Progresista (PNP).

Lo decretó y firma,

Maite D. Oronoz Rodríguez
Jueza Presidenta

CERTIFICO:

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Nelson Rosario Rodríguez, en su capacidad oficial como Comisionado Electoral del Partido Proyecto Dignidad<br><br>Recurrido<br><br>v.<br><br>Ricardo A. Rosselló Nevares<br><br>Recurrido<br><br><br>Gerardo Cruz Maldonado, en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD)<br><br>Peticionario<br><br>Hon. Francisco Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones;<br>Roberto Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); Olvin Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Partido Movimiento Victoria Ciudadana (MVC); Vanessa Santo Domingo, en su capacidad oficial como Comisionada Electoral del Partido Nuevo Progresista (PNP) | CC-2021-0459<br>Cons. con<br>CC-2021-473 |  |

Recurridos

_____

Nelson Rosario Rodríguez, en su carácter oficial de Comisionado Electoral del Partido Proyecto Dignidad

Peticionario

v.

Ricardo A. Rosselló Nevares

Recurrido

Hon. Francisco Rosado Colomer, en su carácter de Presidente de la Comisión Estatal de Elecciones; Roberto Aponte Berríos, en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); Olvin Valentín Rivera, en su carácter de Comisionado Electoral del Partido Movimiento de Victoria Ciudadana (MVC); Gerardo Cruz Maldonado, en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); Vanessa Santo Domingo, en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP)

Recurridos

Sala Especial de Verano integrada por la Jueza Presidenta Oronoz Rodríguez, la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Rivera García, el Juez Asociado señor Feliberti Cintrón y el Juez Asociado señor Estrella Martínez

RESOLUCIÓN

En San Juan, Puerto Rico, a 20 de julio de 2021.

Atendidos los recursos de certiorari de epígrafe se ordena su consolidación y se provee no ha lugar a ambos por considerar que la Sentencia emitida por el Tribunal de Apelaciones el 8 de julio de 2021 es sustancialmente correcta.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió la siguiente expresión: "La Jueza Presidenta Oronoz Rodríguez difiere del proceder de una mayoría de los integrantes de la Sala de no remitir esta controversia al Pleno del Tribunal para su evaluación. Tenemos ante nuestra consideración un asunto novel e importante para el derecho electoral que amerita una expresión del Máximo Foro judicial. Por esa razón, hubiese expedido".

El Juez Asociado señor Estrella Martínez emitió un Voto particular disidente.


                                José Ignacio Campos Pérez
                                Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Nelson Rosario Rodríguez,
en su capacidad oficial
como Comisionado Electoral
del Partido Proyecto
Dignidad

Recurrido

v.

Ricardo A. Rosselló
Nevares

Recurrido


Gerardo Cruz Maldonado, en
su carácter de Comisionado
Electoral del Partido
Popular Democrático (PPD)

Peticionario

Hon. Francisco Rosado
Colomer, en su capacidad
oficial como Presidente de
la Comisión Estatal de
Elecciones;
Roberto Aponte Berríos, en
su capacidad oficial como
Comisionado Electoral del
Partido Independentista
Puertorriqueño (PIP);
Olvin Valentín Rivera, en
su capacidad oficial como
Comisionado Electoral
del Partido Movimiento
Victoria Ciudadana (MVC);
Vanessa Santo Domingo, en
su capacidad oficial como
Comisionada Electoral del
Partido Nuevo Progresista
(PNP)

Recurridos

CC-2021-0459
Cons. con
CC-2021-473

Nelson Rosario Rodríguez, en su carácter oficial de Comisionado Electoral del Partido Proyecto Dignidad

Peticionario

v.

Ricardo A. Rosselló Nevares

Recurrido

Hon. Francisco Rosado Colomer, en su carácter de Presidente de la Comisión Estatal de Elecciones; Roberto Aponte Berríos, en su carácter de Comisionado Electoral del Partido Independentista Puertorriqueño (PIP); Olvin Valentín Rivera, en su carácter de Comisionado Electoral del Partido Movimiento de Victoria Ciudadana (MVC); Gerardo Cruz Maldonado, en su carácter de Comisionado Electoral del Partido Popular Democrático (PPD); Vanessa Santo Domingo, en su carácter de Comisionada Electoral del Partido Nuevo Progresista (PNP)

Recurridos

Voto particular disidente emitido por el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 20 de julio de 2021.

La controversia que hoy tiene ante su consideración este Tribunal provee el escenario ideal para que ejerciéramos nuestro rol y reconociéramos que los

tribunales tienen la jurisdicción para atender y resolver en los méritos controversias de esta naturaleza. De tal forma, procedía descargar esa responsabilidad para pautar normas claras que ilustraran en torno al tratamiento igualitario que debe impartirse a toda persona que persiga ocupar un puesto público electivo y, con ello, la exigencia estricta de su cumplimiento con los requisitos legales aplicables.

Ante la denegatoria de una mayoría de una Sala Especial de Verano de recomendar al Pleno expedir y considerar la controversia en los méritos, se sostiene una Sentencia emitida por el Tribunal de Apelaciones cuyas conclusiones jurídicas debieron ser corregidas. Con ello, se descartan las interpretaciones más armoniosas y razonables dirigidas a garantizar la pureza de los procesos electorales. Por tal razón, en el presente disenso expondré la improcedencia de sostener el curso desacertado del Tribunal de Apelaciones que desembocó en un dictamen errado.

Los fundamentos de mi disenso tienen como base las premisas siguientes:

**Premisa #1:**

Los requisitos dispuestos en la <u>Ley para crear la delegación congresional de Puerto Rico</u>, <u>infra</u>, tienen que ser cumplidos, previo a la elección especial ordenada, por todas las personas que sean electas, incluyendo por nominación directa.

**Premisa #2:**

Al igual que los candidatos que figuran en la papeleta de las elecciones generales, los cuales pasan por un filtro de comisiones calificadoras de sus partidos y por procesos administrativos de la Comisión Estatal de Elecciones (CEE), a las personas electas por nominación directa hay que calificarlos y cotejar que cumplan con los requisitos de ley previo a emitir el certificado de elección. En consecuencia, si el Pueblo vota por un menor de edad que incumple con los requisitos de ley, no habría que certificarlo a ciegas. Igualmente, si los electores de un municipio admiran los dotes administrativos de un alcalde retirado y residente de otro Municipio y lo eligen por nominación directa, no es posible certificarlo si incumple con el requisito de residencia exigido por ley.

**Premisa #3:**

Los funcionarios electorales no están obligados a cruzarse de brazos, como tampoco la CEE está obligada a certificar a una persona electa por nominación directa si no cumple con todos los requisitos dispuestos en ley. Es decir, las personas bajo nominación directa no están exentas de ser calificadas y pasar eventualmente por los filtros de cumplimiento de requisitos que provee nuestro ordenamiento jurídico electoral.

**Premisa #4:**

El Poder Judicial no tiene las manos atadas y no puede hacerse de la vista larga antes de que se certifique

finalmente a una persona electa por nominación directa, aun cuando exista prueba incontrovertida de que la persona no cumple con todos los requisitos en ley para ocupar el cargo.

**Premisa #5:**

Los comisionados electorales que tengan evidencia de que la persona electa por nominación directa incumple con algún requisito, tienen un deber con el interés público de así hacerlo constar y podrán presentar una acción de descalificación, según contemplada en el Artículo 8 de la Ley para crear la delegación congresional de Puerto Rico, infra, a fin de evitar la expedición de un certificado de elección contrario a derecho.

**Premisa #6:**

El axioma de la igualdad electoral está presente en esta controversia. Máxime, cuando se trata de una ley que promueve un proceso dirigido a conseguir la igualdad política. Por tanto, procede impartir un trato igualitario a todas las personas que sean electas para ocupar los cargos de delegados especiales.

La razón y los fundamentos de Derecho contenidos en este disenso me obligan a aplicar estas premisas, las cuales fueron obviadas por el Tribunal de Apelaciones. Por tanto, resultaba imperativo que este Tribunal se expresara y revocara al foro apelativo intermedio con el propósito de impartir mayor confianza en nuestro sistema electoral, lo cual no ocurrió ante la denegatoria de una mayoría de una Sala Especial de Verano. Me explico.

**I**

El 16 de mayo de 2021, tomó lugar una elección especial en virtud de la <u>Ley para crear la delegación congresional de Puerto Rico</u>, Ley Núm. 167-2020, 16 LPRA secs. 985-985p (Ley para crear la Delegación Congresional), en la cual el Pueblo eligió a los delegados congresionales que trabajarán para convertir a Puerto Rico en un estado de la Unión Americana. En los comicios celebrados, a pesar de que el exgobernador Ricardo Rosselló Nevares (exgobernador Rosselló Nevares o Querellado) no figuró como candidato en la papeleta, éste resultó electo por nominación directa.[1] Por consiguiente, luego de concluido el escrutinio general, el 1 de junio de 2021, la CEE certificó que el exgobernador Rosselló Nevares obtuvo un total de 54,823 votos, por lo que lo declaró electo para el cargo de delegado especial a la Cámara de Representantes federal.

Así las cosas, el 8 de junio de 2021, el Comisionado Electoral del partido Proyecto Dignidad, el Lcdo. Nelson Rosario Rodríguez (Comisionado del PD o Querellante), presentó una Querella en la que, en síntesis, alegó que el exgobernador Rosselló Nevares no cumplió con los requisitos para ser delegado especial, según estatuidos en la Ley para crear la Delegación Congresional, <u>supra</u>. Particularmente,

---

[1] Tomamos conocimiento de la existencia de esfuerzos públicos dirigidos a promover, previo al evento electoral, la elección del exgobernador Rosselló Nevares y que éste públicamente aceptó su disponibilidad y disposición para asumir al cargo.

alegó que, entre otros requisitos, el Artículo 8 de la precitada ley requería que el delegado fuese: (1) **residente** de **Puerto Rico o Washington, D.C., y** (2) un **elector activo y hábil domiciliado en Puerto Rico**. Sobre el particular, el Querellante arguyó que el Querellado debía ser descalificado por incumplir con los requisitos de residencia y domicilio electoral. A esos efectos, planteó que el Querellado residía exclusivamente en Virginia y, además, que no estaba domiciliado en Puerto Rico por, entre otras razones, estar inscrito como elector en Virginia.

En respuesta, el 22 de junio de 2021, el exgobernador Rosselló Nevares alegó que los requisitos del Artículo 8 de la Ley para crear la Delegación Congresional, supra, no le son oponibles. Sostuvo que tales requisitos son de aplicabilidad exclusiva a los candidatos para ser delegados y él nunca figuró como tal, sino que fue escogido mediante votos por nominación directa.

No obstante, planteó que el requisito de residencia en Puerto Rico o Washington, D.C. cobraba eficacia cuando el delegado congresional comenzara sus labores, lo que, por disposición de ley, ocurriría a partir del 1 de julio de 2021. Asimismo, el Querellado expresó que es un elector activo y hábil domiciliado en Puerto Rico por razón de que no se había iniciado un proceso de recusación en su contra. Además, arguyó que la venta de su residencia en la ciudad de Guaynabo, la cual constaba inscrita en la CEE como su domicilio electoral, no provocó que éste perdiera su

domicilio. Ello, pues, posterior a la venta, se domicilió en la residencia de su suegro en San Juan. Respecto a la inscripción como elector en Virginia, el exgobernador Rosselló Nevares argumentó que, por disposición de ley, el estado inscribe como elector automáticamente a toda persona que solicita una licencia de conducir. Expresó que es por tal razón que figura como elector en Virginia.

Así las cosas, el 22 de junio de 2021, el Tribunal de Primera Instancia celebró una vista en la cual emitió un remedio provisional para que la CEE se abstuviera de certificar al exgobernador Rosselló Nevares como delegado congresional mientras se dilucidaban los méritos del caso. Posteriormente, específicamente el 28 de junio de 2021, el foro primario celebró una vista evidenciaria en la cual comparecieron el Querellante y el Querellado, así como la representación legal de la Comisionada del Partido Nuevo Progresista y los Comisionados del Partido Popular Democrático, el Partido Independentista Puertorriqueño y el Movimiento Victoria Ciudadana. En la vista testificaron el exgobernador Rosselló Nevares, el Comisionado del PD y el Secretario de la CEE.

Luego de evaluar la prueba documental y aquilatar los testimonios, el Tribunal de Primera Instancia emitió una Sentencia en la cual descalificó al exgobernador Rosselló Nevares como delegado congresional. Lo anterior, pues, resolvió que una persona electa mediante votos por nominación

directa debe cumplir con todos los requisitos estatuidos en Ley para crear la Delegación Congresional, supra.

En específico, el foro primario estimó que, toda vez que el Querellado fue electo mediante nominación directa, estos requisitos debían cumplirse al momento de la elección, a saber, el 16 de mayo de 2021. Por consiguiente, evaluó si, a tal fecha, el exgobernador Rosselló Nevares era residente de Puerto Rico o Washington, D.C., y, además, si era un elector hábil y con domicilio electoral en Puerto Rico.

Por un lado, determinó que el Querellado incumplió con el requisito de residencia, debido a que éste expresó en la vista que, desde agosto de 2019, se trasladó a Virginia a residir con su familia y, desde entonces y hasta la fecha de la elección, no había residido en Puerto Rico ni en Washington, D.C. Por otro, concluyó que el Querellado también incumplió con el requisito de ser un elector activo y hábil domiciliado en Puerto Rico por razón de que estaba registrado como elector activo en Virginia de manera simultánea con Puerto Rico. Asimismo, precisó que, en vista de que todas las actividades habituales e intereses de índole personal, familiar y profesional tenían su núcleo en Virginia, el Querellado está domiciliado en Virginia.

Inconforme, el viernes, 2 de julio de 2021, la Comisionada Electoral del Partido Nuevo Progresista presentó un auxilio de jurisdicción y una apelación ante el Tribunal de Apelaciones. A través del auxilio solicitó que se dejara sin efecto el remedio provisional que detuvo la certificación

del Querellado como delegado congresional. Mediante la apelación, señaló que el foro primario erró al: (1) conceder el remedio provisional; (2) asumir jurisdicción; (3) legislar por _fiat judicial_ los requisitos para funcionarios electos por nominación directa no establecidos en la ley, y (4) determinar que el Querellado no cumplió con los requisitos de residencia ni domicilio. En igual fecha, el Tribunal de Apelaciones concedió a las partes hasta el martes, 6 de julio de 2021, para que se expresaran sobre la apelación presentada.

No obstante, el 6 de julio de 2021, de manera precipitada, el foro apelativo intermedio emitió una resolución en la que declaró _ha lugar_ la solicitud para que se dejara sin efecto el remedio provisional y, por consiguiente, autorizó la continuación de los procesos conducentes a la certificación de la elección del exgobernador Rosselló Nevares. En el ínterin, el Querellado completó la documentación relacionada con el proceso de certificación y, en consecuencia, el 7 de julio de 2021, juramentó al cargo de delegado congresional a la Cámara de Representantes de Estados Unidos.

Al día siguiente, el Tribunal de Apelaciones emitió una Sentencia en la que, en síntesis, desestimó la impugnación debido a que entendió que la controversia no estaba madura. Por consiguiente, determinó que el Tribunal de Primera Instancia carecía de jurisdicción para descalificar al exgobernador Rosselló Nevares como delegado congresional,

pues el estatuto provee para que el proceso de impugnación ocurra una vez el candidato sea certificado de forma final. A su vez, concluyó que el Comisionado del PD no contaba con la legitimación activa para impugnar al Querellado, toda vez que bajo la ley electoral sólo un candidato tiene el derecho para impugnar a otro.

En desacuerdo, el 15 de julio de 2021, el Comisionado del Partido Popular Democrático comparece ante este Tribunal y, en esencia, señala que el Tribunal de Apelaciones erró al declarar que el Tribunal de Primera Instancia no ostentaba la jurisdicción para descalificar al exgobernador Rosselló Nevares. Esto, debido a que el Artículo 8 de la Ley para crear la Delegación Congresional, supra, no establece que la CEE debe emitir un certificado de elección como condición previa para que un delegado pueda ser impugnado.[2] Además, planteó que el foro apelativo intermedio también erró al delimitar la legitimación activa para la impugnación del delegado electo exclusivamente por otro delegado que haya participado de la elección. Por tanto, solicitó que expidiéramos el recurso con el propósito de revocar al Tribunal de Apelaciones y, en su lugar, confirmar el dictamen del Tribunal de Primera Instancia.

---

[2] Asimismo, el 16 de julio de 2021, el Comisionado Electoral del Partido Independentista Puertorriqueño presentó su alegato y, en esencia, reitera argumentos similares a los esbozados por el Comisionado Electoral del Partido Popular Democrático.

Por otra parte, el Comisionado del PD comparece mediante una Petición de certiorari y nos solicita que revoquemos la Sentencia recurrida toda vez que, según alegó, la Comisionada Electoral del Partido Nuevo Progresista no tenía legitimación activa para presentar una apelación en beneficio del Querellado y dado a que el foro apelativo intermedio sí contaba con jurisdicción para atender la querella. Luego de contar con la comparecencia de las partes, nos encontramos en posición de resolver.

Por los fundamentos que expondré a continuación, opino que el Tribunal de Apelaciones erró al determinar que la controversia no estaba madura para ser atendida por el Tribunal de Primera Instancia y, en consecuencia, revocar el dictamen del foro primario.

## II

La Ley para crear la Delegación Congresional, supra, estableció las reglas que gobernarían la celebración de una elección especial en la que el Pueblo puertorriqueño elegiría a la delegación congresional que nos representaría ante el Senado y la Cámara de Representantes de los Estados Unidos. 16 LPRA sec. 985a.

El problema colonial de Puerto Rico es un asunto de suma seriedad y los mecanismos que utilice el Pueblo para erradicarlo deben ser tomados e instrumentados con solemnidad. En ese sentido, la selección de los delegados congresionales constituyó un acto afirmativo a los fines de implementar el llamado Plan Tennessee y, consecuentemente,

lograr la descolonización de Puerto Rico. Este plan no es de cuño reciente, sino que Tennessee lo usó por primera vez en el 1776 como parte de un mecanismo válido de selección de congresistas federales para ejercer presión sobre el Congreso hasta adquirir su admisión a la Unión. Todas las comunidades políticas que posteriormente han recurrido al Plan Tennessee han logrado su admisión como estado, a saber: Michigan (1837), Iowa (1846), California (1850), Oregón (1859), Kansas (1861) y Alaska (1959).[3]

Con el propósito similar de lograr nuestra descolonización, la función principal de los delegados congresionales electos al amparo de la Ley para crear la Delegación Congresional, supra, será representar a Puerto Rico ante el Congreso "para exigir que se respete el mandato electoral a favor de la Estadidad y que se proceda a admitir a Puerto Rico como un Estado de Estados Unidos de América. . .". Exposición de Motivos, Ley para crear la Delegación Congresional, supra.

Para instrumentar este ideal, el 16 de mayo de 2021 se celebró una elección especial en la cual el Pueblo votó por los delegados que abogarán en el Congreso por la estadidad de Puerto Rico. 16 LPRA sec. 985i. Según se verá más adelante, de conformidad con el Artículo 8 de la Ley para crear la Delegación Congresional, supra, éstos tenían que cumplir con

---

[3]Véase, Jesse L. Jackson, The State of New Columbia-A Call for Justice and Freedom, 39 CATH. U. L. REV. 307, 308 (1990).

los requisitos siguientes: (1) mayoría de edad; (2) dominio de los idiomas español e inglés; (3) cumplir con las disposiciones del Artículo 7.2 de la Ley 58-2020, y (4) ser residentes de Puerto Rico o de Washington, D.C.

Según alega el Comisionado del PD, el exgobernador Rosselló Nevares incumplió con, al menos, dos (2) de estos requisitos. Ahora bien, dado a que el Tribunal de Apelaciones concluyó que el Tribunal de Primera Instancia actuó sin jurisdicción, estimo apropiado atender con preeminencia tal planteamiento antes de entrar a dilucidar la controversia en los méritos. Veamos.

### III

### A.

De entrada, destaco que el Tribunal de Apelaciones erró al revocar la Sentencia dictada por el Tribunal de Primera Instancia bajo la premisa de que la controversia no estaba madura y, por consiguiente, declarar que el foro primario actuó sin jurisdicción.

Para ello, el Tribunal de Apelaciones se amparó en su interpretación del Artículo 8 de la Ley para crear la Delegación Congresional, supra. Al hacerlo, concluyó que la CEE, primeramente, debe finalizar el escrutinio general, luego emitir el resultado final y oficial, y, una vez **certifica** la elección de forma final, entonces procede la descalificación. De este modo, determinó que el **único proceso** que se estableció en la Ley para crear la Delegación Congresional para descalificar a cualquier delegado electo,

debe ocurrir luego de que la CEE emita el certificado de elección.[4] Como agravante, interpretó que es a partir de que se emite el certificado de elección que un candidato "viene obligado a cumplir con los requisitos de los Artículos 7.2 y 10.11 del Código Electoral, y del Artículo 8 de la Ley 167-2020".[5]

Esta interpretación no sólo es desacertada, sino que contraviene expresamente el Artículo 8 de la Ley para crear la Delegación Congresional, supra. Además, tampoco encuentra apoyo en el Código Electoral de Puerto Rico, Ley Núm. 58-2020, 16 LPRA sec. 4501, et seq. (Código Electoral). Veamos

El Artículo 8 de la Ley para crear la Delegación Congresional, supra, íntegramente dispone lo siguiente:

> Los **candidatos a ser delegados especiales** deberán ser mayores de edad; dominar los idiomas español e inglés; **cumplir con las disposiciones del Artículo 7.2 de la Ley 58-2020; ser residentes de Puerto Rico o de Washington, DC;** para participar de la elección, deberán comprometerse bajo juramento a defender el mandato del Pueblo expresado el pasado 3 de noviembre de exigir que Puerto Rico sea admitido como un Estado de Estados Unidos; y deberán comprometerse, bajo juramento, a trabajar activamente a tiempo completo durante el término de su cargo para lograr ese fin. **Cualquier persona que incumpla con alguno de estos**

---

[4]De conformidad con el Artículo 2.3(18) del Código Electoral de Puerto Rico, infra, la certificación de elección es un "[d]ocumento donde la Comisión declara electo a un candidato a un cargo público electivo o el resultado de cualquier elección, después de un escrutinio general o recuento". Íd.

[5]Véase, Apéndice de certiorari, Sentencia [del Tribunal de Apelaciones], pág. 24.

> **requisitos podrá ser descalificado** en el Tribunal de Primera Instancia de San Juan. Cualquier sustituto que sea necesario se seleccionará por elección especial de la Comisión Estatal de Elecciones, de conformidad con las disposiciones que para esto establezca dicho organismo gubernamental.(Énfasis suplido).

De lo anterior, se desprende que **los candidatos** a ser delegados deberán cumplir con una serie de requisitos sustantivos. Nótese que expresamente el legislador hizo referencia a **candidatos** y no a **delegados electos**. Luego, el artículo precitado dispone que, **previo a la elección**, **estos candidatos** deberán cumplir con otros requisitos relacionados a su compromiso con adelantar el fin de la Ley para crear la Delegación Congresional.

Como apoyo a que la descalificación del candidato debe realizarse previo a la certificación de elección, el propio Artículo 8 de la Ley para crear la Delegación Congresional, supra, establece que **cualquier persona** que no cumpla con estos requisitos, podrá ser **descalificado**. Adviértase que el artículo precitado no condiciona ni limita cuándo deberá instarse el proceso de descalificación. Tampoco restringe quién puede presentar tal proceso. Asimismo, nada en el Artículo 8 de la Ley para crear la Delegación Congresional, supra, establece que la descalificación debe ocurrir luego de que la CEE emita el certificado de elección, conforme concluyó el Tribunal de Apelaciones erróneamente. Igualmente relevante para esta controversia en particular, es evidente que el concepto "cualquier persona" abarca tanto a candidatos

que figuraron en la papeleta como a personas bajo la modalidad de nominación directa.

En cambio, toda vez que el Artículo 8 de la Ley para crear la Delegación Congresional, <u>supra</u>, instrumenta la descalificación de **candidatos**, ésta debe instarse antes que se emita la certificación final, pues, a ese momento, sólo resta el cumplimiento de los requisitos relacionados con la entrega del estado de situación financiera y con el curso de uso de fondos y propiedad pública exigido por ley.[6]

Bajo la premisa del Tribunal de Apelaciones, la CEE debe declarar y certificar electo a un candidato sin consideración con respecto a si éste cumplió con los requisitos estatutarios. Tal premisa es improcedente dado a que el Artículo 8 de la Ley para crear la Delegación Congresional, <u>supra</u>, establece diáfanamente que los candidatos deberán cumplir con los requisitos **previo a la celebración de la elección.** Como cuestión de hecho, así ocurrió con los candidatos que figuraron en la papeleta de la elección

---

[6]El texto íntegro del Artículo 10.11 del Código Electoral, <u>supra</u>, dispone lo siguiente:

> La Comisión **declarará y certificará electo** para cada cargo al Candidato que reciba la mayor cantidad de votos válidos y directos. Como constancia de ello, **expedirá un certificado de elección que será entregado al candidato electo una vez acredite que ha tomado el Curso** sobre Uso de Fondos y Propiedad Pública y haya hecho entrega de su Estado de Situación Financiera Revisado. Se exceptúa al legislador municipal del último requisito. (Énfasis suplido).

congresional. Y es que no puede ser de otro modo, pues, como veremos bajo el Acápite III(C), concluir lo contrario provocaría que, por fiat judicial y en contravención de la intención legislativa, se postergue para otro tipo de candidato el cumplimiento con los requisitos exigidos por el Artículo 8 de la Ley para crear la Delegación Congresional, supra.

Por tanto, y teniendo en consideración que el Artículo 8 expresamente dispone que las disposiciones de la Ley para crear la Delegación Congresional, supra, tendrán primacía sobre cualquier otra disposición de ley que contravenga lo allí establecido, sostengo que la controversia estaba madura y debió atenderse en los méritos.

Ello, incluso, es cónsono con lo establecido por el Artículo 7.5 del Código Electoral, supra, con respecto a la **descalificación** de candidatos, el cual dispone que:

> **Cualquier** Aspirante o **Candidato nominado podrá ser descalificado** como tal, por el Tribunal de Primera Instancia, cuando medie querella **porque no cumple con los requisitos impuestos por** la Constitución o **la ley, o cuando se demostrare que ha violado cualesquiera de las disposiciones de esta Ley** o de sus reglamentos.
>
> . . .
>
> (Énfasis suplido).

Como vemos, el Código Electoral tampoco sujeta la descalificación de un **candidato** a que, finalmente, la CEE haya emitido un certificado de elección. Por consiguiente, el procedimiento estatuido en el Artículo 7.5 del Código

Electoral, <u>supra</u>, es perfectamente armonizable con el Artículo 8 de la Ley para crear la Delegación Congresional, <u>supra</u>.

**Es, precisamente, dado el hecho de que todavía no existía un certificado de elección que resultaba inapropiado acudir al Artículo 10.15 del Código Electoral**, <u>supra</u>.[7] Nótese que, a diferencia del Artículo 7.5 del Código Electoral, <u>supra</u>, el cual está predicado en impugnaciones por razón de que el candidato incumplió con los requisitos dispuestos por ley, el Artículo 10.15 del Código Electoral, <u>supra</u>, cobra efecto, primeramente, si se trata de una impugnación de elección y, sobre todo, cuando tal impugnación se fundamenta en razones que provocarían un cambio en el resultado de la elección. **Claramente, lo aquí cuestionado se ciñe a un incumpliento de los requisitos exigidos por ley a los**

---

[7]En lo pertinente, el Artículo 10.15 dispone lo siguiente:

> Cualquier Candidato que impugnare la elección de otro, deberá presentar ante el Juez en la Sala de la Región Judicial de San Juan designada de conformidad con el Capítulo XIII de esta Ley, y dentro de los diez (10) días siguientes a la fecha de notificación de la certificación de elección para cada cargo público electivo en el escrutinio general, un escrito, exponiendo bajo juramento las razones en que fundamenta su impugnación, las que deberán ser de tal naturaleza que, de probarse, bastarían para cambiar el resultado de la elección.
>
> . . .
>
> Íd.

**delegados congresionales, por lo que el Artículo 10.15 del Código Electoral**, supra, **está predicado en un supuesto que, ni tan siquiera, es aplicable a la controversia de autos.** Máxime cuando nos encontramos ante una elección especial sui generis que no puede encajonarse ni equipararse a una elección general con rigorismos y tecnicismos que impidan que los funcionarios electorales o los tribunales puedan pasar juicio sobre los requisitos de un candidato electo previo a ser juramentado.

Atendido el planteamiento jurisdiccional, reitero que éste es inmeritorio y que los propios estatutos que rigen demuestran que erró el Tribunal de Apelaciones en disponer lo contrario. Procedía, entonces, atender el caso en los méritos. Veamos

**B.**

De conformidad con el Artículo 8 de la Ley para crear la Delegación Congresional, supra, y en lo pertinente a la controversia ante nos, la Ley para crear la Delegación Congresional impone como requisito que los delegados sean residentes de Puerto Rico o Washington, D.C. Este requisito no se encuentra definido en la Ley para crear la Delegación Congresional, como tampoco en el Código Electoral, el cual, según la propia Ley para crear la Delegación Congresional, rige supletoriamente en la instrumentalización del plebiscito electoral. 16 LPRA sec. 985b.

Ahora bien, el requisito de ser residente no es ajeno a nuestro ordenamiento jurídico y, como veremos, es

distinguible del segundo requisito aquí en pugna: el domicilio electoral. No obstante, previo a establecer tal distinción y, a su vez, declarar la validez de que se exijan ambos requisitos, considero apropiado descartar la proposición del Querellado de que no le son oponibles los requisitos que la ley dispone porque éstos fueron reservados exclusivamente para los candidatos. Según se explicará, tal enunciado es jurídicamente improcedente.

Sobre este particular, nos resulta altamente persuasivo cómo otras jurisdicciones de los Estados Unidos han aplicado los requisitos para candidaturas a escaños públicos. Algunos ejemplos de ello se listan a continuación con el fin de determinar si es jurídicamente correcto el darle un trato distinto a las personas electas por nominación directa en comparación a las personas que presentaron su intención de candidatura previo a la elección. Adelanto que la línea jurisprudencial reseñada a continuación no exime al candidato por nominación directa de cumplir con los requisitos dispuestos a la fecha de elección que son aplicables a otros candidatos. Veamos.

En _State ex rel. Wellington v. Mahoning Cty. Bd. of Elections_, 120 Ohio St. 3d 198, 897 N.E.2d 641 (2008), el Tribunal Supremo de Ohio denegó el que un aspirante a alguacil cuya candidatura fue rechazada por incumplir con un requisito de educación postsecundaria pudiera entonces aspirar al cargo por la vía de la nominación directa. Esto, pues, perduraba el incumplimiento con los requisitos

impuestos legislativamente. De forma similar, en Rawls v. Zamora, 107 Cal. App. 4th 1110, 132 Cal. Rptr. 2d 675 (2003), la Corte de Apelaciones de Distrito en California descartó la candidatura por nominación directa de un aspirante a alguacil que no cumplió con el requisito legislativo de experiencia previa como agente del orden público.

De lo antes expuesto, resulta relevante resaltar la validez legal de aquellos requisitos estatutarios que, entre otros elementos y así aplicados a todos los candidatos por igual, son neutrales y van dirigidos a garantizar la validez del proceso electoral. Ello, pues, como concluyó el tribunal "[t]here can be no doubt that **the state has a strong interest in assuring that a person with aspirations to hold office is qualified** to administer the complexities of that office. And **the authority of the state to determine the qualifications of their most important governmental officials is an authority that lies at the heart of representative government**". (Énfasis suplido) Íd., pág. 1117 (citas omitidas).

Asimismo, e incluso aún más pertinente para esta controversia, cortes estatales han mantenido la igual aplicabilidad de los requisitos específicos de **residencia a todo tipo de candidato.** Así, en Matthews v. Steinberg, 153 So. 3d 295, 296 (Fla. Dist. Ct. App. 2014), aff'd, No. SC14-2202, (Fla. June 22, 2016), la Corte de Apelaciones del Distrito de Florida invalidó un estatuto que exigía únicamente a los candidatos por nominación directa el

cumplimiento con el requisito de residencia al momento de cualificar como candidato, a pesar de que la constitución estatal requería la residencia al momento de la elección. **Tal determinación se fundamentó en que el requerimiento de elegibilidad aplica a cada legislador, "regardless of party affiliation or whether the legislator appeared on the ballot as a write-in or not"**. (Énfasis suplido). Íd., pág. 296. Ello se reafirmó en <u>Brinkmann v. Francois</u>, 184 So. 3d 504 (Fla. 2016), donde, ante circunstancias similares en cuanto al requisito de residencia entre candidatos por nominación directa y candidatos de papeleta, la Corte Suprema de Florida no avaló un trato distinto al aspirante por nominación directa.

Como puede apreciarse, se desprende diáfanamente la tendencia a validar un trato igualitario de los requisitos de candidatura para toda categoría de candidatos o posibilidad de elegibilidad. Esto, incluso, en jurisdicciones en las que resulta más oneroso aspirar por nominación directa por exigir requisitos previos para poder figurar como nominado, los cuales permiten comprobar los requisitos ordenados por ley.

En atención a ello, y potencialmente como parte del reconocimiento de que debe existir un trato igualitario en cuanto a los requisitos que debe cumplir un candidato <u>vís a vís</u> una persona elegida por nominación directa, en la certificación emitida el 1 de junio de 2021, la CEE expresó lo siguiente:

De conformidad con el Artículo 10.11 del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, todo candidato electo deberá radicar en la Comisión un estado de situación financiera revisado y acreditar que ha tomado el Curso sobre uso de Fondos y Propiedad Pública, previo a la expedición del Certificado de Elección como candidato electo. De la misma forma, cualquier persona electa por nominación directa deberá cumplir con la presentación de los documentos que requiere el Artículo 8 de la Ley Núm. 167-2020, así como también con los Artículos 7.2 y 10.11 del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020. La Comisión no certificará a ningún candidato que no cumpla con los requisitos aquí dispuestos.[8]

Obsérvese cómo la CEE expresamente implantó mecanismos dirigidos a descargar su responsabilidad de velar que el delegado electo por nominación directa cumpla con todos los requisitos dispuestos en ley en comparación con aquel que fue electo y figuró como candidato. Claro está, por la naturaleza de la selección por nominación directa y por el carácter _sui generis_ que representa este tipo de votación, resulta obvio que se dilata la exigencia de los requisitos exigidos a los seleccionados por nominación directa, más no los exime de su cumplimiento. Es decir, la persona que resultó electa por nominación directa debe cumplir con los

_____

[8]Apéndice de _certiorari_, _Apelación de Sentencia del 2 de julio de 2021_, Certificación, págs. 267-268. Adviértase que la Comisionada Electoral del Partido Nuevo Progresista mostró su conformidad y firmó la certificación precitada, la cual, como destacamos, exige expresamente que el delegado electo por nominación directa cumpla con los requisitos estatuidos en el Artículo 8 de la Ley para crear la Delegación Congresional, _supra_.

mismos requisitos que, previo a la elección, cumplieron los candidatos que figuraron en la papeleta. Esto es, el Artículo 8 de la Ley para crear la Delegación Congresional, supra, el cual, en sí mismo, también exige que satisfagan los requisitos del Artículo 7.2 del Código Electoral, supra.

Es evidente que la directriz administrativa dispone que cualquier persona que incumpliera con los requisitos exigidos no sería certificada. Esto, pues, no existe justificación en Derecho para otorgarle un trato ni más oneroso, ni más preferente a un candidato tradicional en comparación con un funcionario elegido por nominación directa. Tal pretensión no encuentra apoyo en la Ley para crear la Delegación Congresional ni mucho menos en el Código Electoral.

**Por tanto, para fines de la controversia ante nos, todos los requisitos estatuidos en el Artículo 8 de la Ley para crear la Delegación Congresional, supra, que les fueron exigidos previo a la elección a los candidatos que figuraron en la papeleta, son igualmente aplicables a una persona electa por nominación electa que se encuentra bajo el escrutinio de ser certificada como delegado congresional.**

Resuelto lo anterior, procedo, entonces, a determinar cuándo una persona electa por nominación directa debe cumplir con tales requisitos.

### C.

Según adelantado y discutido en el Acápite III(A), el Artículo 8 de la Ley para crear la Delegación Congresional, supra, exige su cumplimiento en una etapa temprana en el

proceso electoral, ya que su lenguaje expresamente dispone que estos requisitos le serán exigidos a "[l]os **candidatos** a ser delegados especiales".[9]

Nos encontramos ante un ejercicio válido de la Asamblea Legislativa, la cual, al igual que otros Cuerpos Legislativos Estatales, tiene la facultad de disponer en qué momento un funcionario electo debe cumplir con determinados requisitos. Bajo la ley que nos ocupa, queda claro que los requisitos para el cargo deben concurrir al momento de la elección.

De hecho, el legislador descartó expresamente otras opciones igualmente válidas que ha adoptado en legislaciones diferentes, como la de requerir el cumplimiento de los requisitos al momento de la juramentación del cargo. A modo de ejemplo, el Código Municipal de Puerto Rico, Ley Núm. 107-2020, exige el cumplimiento de ciertos requisitos para el

---

[9]Según incluido anteriormente, el Artículo 8 de la Ley para crear la Delegación Congresional, supra, dispone lo siguiente:

> Los **candidatos a ser delegados especiales** deberán ser mayores de edad; dominar los idiomas español e inglés; **cumplir con las disposiciones del Artículo 7.2 de la Ley 58-2020; ser residentes de Puerto Rico o de Washington, DC;** para participar de la elección, deberán comprometerse bajo juramento a defender el mandato del Pueblo expresado el pasado 3 de noviembre de exigir que Puerto Rico sea admitido como un Estado de Estados Unidos; y deberán comprometerse, bajo juramento, a trabajar activamente a tiempo completo durante el término de su cargo para lograr ese fin. . .. (Énfasis suplido). Íd.

cargo de **alcalde** y expresa claramente cuándo éstos serán exigibles. A esos efectos, el Artículo 1.011 de la ley concretamente exige que los requisitos se cumplan **a la fecha de tomar posesión del cargo.**[10] A pesar del claro contraste de la redacción legislativa entre ambos estatutos con respecto al momento de umbral para la satisfacción de los requisitos, la Sentencia recurrida tiene el efecto de permitir el cumplimiento de los requisitos en una etapa posterior a la dispuesta expresamente por el legislador.

Por analogía, la experiencia de los cargos electivos constitucionales también resulta ilustrativa en torno al momento particular en que deben concurrir los requisitos para ocupar determinado cargo. Sabido es que surge categóricamente de la Constitución de Puerto Rico que, para los cargos de los miembros de la Asamblea Legislativa y del Gobernador, el

---

[10]En lo pertinente, el texto precitado dispone lo siguiente:

> Todo aspirante a Alcalde deberá cumplir a la fecha de tomar posesión del cargo, con los siguientes requisitos:
> (a) Tener veintiún (21) años de edad o más.
> (b) Saber leer y escribir.
> (c) Ser ciudadano de Estados Unidos, domiciliado en el municipio por no menos de un (1) año antes de la fecha de su elección.
> (d) Ser elector cualificado del municipio.
>
> . . .
>
> 21 LPRA sec. 7021.

momento en que debe cumplirse con los requisitos variará según el cargo.

Por una parte, la Constitución dispone los requisitos que deben cumplir los miembros de la Asamblea Legislativa e ilustra claramente cuándo éstos son exigibles. A estos efectos, el Artículo III, Sección 5 de la Constitución de Puerto Rico dispone que:

> Ninguna persona podrá ser miembro de la Asamblea Legislativa a menos que sepa leer y escribir cualquiera de los dos idiomas, español o inglés; sea ciudadano de los Estados Unidos y de Puerto Rico y haya residido en Puerto Rico por lo menos durante los dos años precedentes **a la fecha de la elección o nombramiento.**
> **Tampoco podrán ser miembros del Senado** las personas que no hayan cumplido treinta años de edad, **ni podrán ser miembros de la Cámara** de Representantes las que no hayan cumplido veinticinco años de edad.[11] (Énfasis suplido).

Se desprende con claridad, pues, que el artículo precitado establece dos (2) momentos para el cumplimiento de los requisitos de educación, ciudadanía y residencia, a saber: a la fecha de la elección o al momento del nombramiento. A diferencia del cargo de Gobernador, el incumplimiento con uno de estos requisitos a la fecha de la elección no implica automáticamente que la persona es

---

[11]Se advierte que se optó por separar las dos (2) oraciones que contiene la disposición constitucional precitada con el propósito exclusivo de ilustrar una mejor comprensión de lo expuesto.

inelegible. En ese caso, la Constitución provee como fecha límite para su cumplimiento el momento del nombramiento.

Ahora bien, en cuanto al requisito de edad, la Constitución no establece un término específico para su cumplimiento. En cambio, simplemente se dispuso que, para ser **miembro** del Senado o **miembro** de la Cámara, debía cumplirse con el requisito de treinta (30) y veinticinco (25) años, respectivamente. No obstante, este Tribunal en <u>Tonos Florenzán v. Bernazard</u>, 111 DPR 546 (1981), tuvo la oportunidad de precisar desde cuándo debía cumplirse con tal exigencia constitucional.

Particularmente, en <u>Tonos Florenzán v. Bernazard</u>, supra, evaluamos si un representante electo y certificado que no poseía el requisito de edad constitucional de veinticinco (25) años podía juramentar al cargo. Toda vez que la disposición constitucional no estableció expresamente cuándo debía cumplirse con la edad mínima, allí interpretamos que el lenguaje de **"ni podrán ser miembros** de la Cámara las que no hayan cumplido veinticinco años. . .",** denotaba que el momento determinante era aquel en el que la persona debía jurar y ocupar el cargo, a saber: el 2 de enero de 1981.[12] Al

_____

[12]Como parte de esta controversia, este Tribunal ya había analizado la cláusula constitucional que exigía el requisito mínimo de edad para ocupar un cargo en la Cámara de Representantes. Al así hacerlo, expresamos lo siguiente:

> Esta disposición expone los requisitos para ser miembro del Senado y de la Cámara de Representantes, no para ser candidato. Al interpretar el Congreso de Estados Unidos las

concluir lo anterior, rechazamos el planteamiento del representante impugnado, quien solicitó que se aplazara su juramentación hasta el 22 de febrero de 1981, fecha en que finalmente cumpliría la edad constitucional para ocupar el cargo.[13] Nótese que en el caso precitado, similar al curso de acción seguido acertadamente por el foro primario en el caso

---

disposiciones de la Sec. 2 y del tercer párrafo de la Sec. 3 del Art. I de la Constitución de Estados Unidos, que a tal respecto son similares, tal ha sido su interpretación. Nogueras v. Tonos Florenzán, 110 DPR 356, 358 (1980) (Sentencia) (citando a 79 Cong. Rec. 9651-53, 9841-42).

[13]En Tonos Florenzán v. Bernazard, supra, fundamentamos la denegatoria de la proposición del candidato impugnado por lo siguiente:

Cualquier otra interpretación infringiría la Constitución en los siguientes aspectos y dimensiones: (a) sería contraria y menoscabaría su texto; (b) afectaría la pronta ordenación y desarrollo normal de las labores de los cuerpos legislativos; (c) vulneraría y debilitaría el principio cardinal de adecuada representación en que descansa nuestra democracia; (d) dejaría al arbitrio de cada candidato o partido político, la determinación de si procede o no una nominación y, por ende, la decisión de cuándo se habrá de eventualmente ocupar un cargo legislativo, creando así incertidumbre en la estabilidad y composición final del Poder Legislativo; (e) relajaría los requisitos constitucionales; y (f) expondría a que en épocas de crudo partidismo político la simple voluntad de una mayoría parlamentaria impusiera distintas exigencias sobre la capacidad de sus miembros, lo cual propiciaría un potencial abuso y privación de derechos. Íd., págs. 550-551.

de autos, la Cámara de Representantes ordenó la paralización de la juramentación hasta tanto los tribunales resolvieran la controversia.

Por otra parte, en cuanto al cargo de Gobernador, la Constitución requiere que la totalidad de los requisitos se cumplan **a la fecha de la elección**. Véase, Art. IV, Sec. 3, Const. PR, LPRA, Tomo 1.[14] Dicho de otro modo, la fecha de la elección es el momento determinante, por lo que, si a ese momento no se satisface alguno de los requisitos, la persona sería inelegible y, por consiguiente, ni tan siquiera podría figurar como candidato a la gobernación. **Bajo este marco, la interpretación que realizó el Tribunal de Apelaciones, a los efectos de que los requisitos para ocupar el cargo son exigibles luego de que la CEE emita el certificado de elección, provocaría cuestionamientos en otras candidaturas, ya que la Constitución, de manera expresa, requiere que los requisitos para el cargo de gobernador se satisfagan a la fecha de la elección. Ello representa un ejemplo más de la necesidad de que este Tribunal ejerciera su rol de pautar el Derecho en esta controversia de alto interés público.**

---

[14]Esta disposición constitucional establece que:

> Nadie podrá ser Gobernador a menos que, a la fecha de la elección, haya cumplido treinta y cinco años de edad, y sea, y haya sido durante los cinco años precedentes, ciudadano de los Estados Unidos de América y ciudadano y residente bona fide de Puerto Rico. Íd.

Ante ese cuadro, además del texto de la ley, un análisis jurídico y hermenéutico al respecto, y de conformidad con lo resuelto por este Tribunal en Tonos Florenzán v. Bernazard, supra, resulta imperativo concluir que la Ley para crear la Delegación Congresional requiere que los requisitos del Artículo 8 se satisfagan previo a la elección, por hacer alusión el legislador a "los candidatos" y no a "los delegados electos".

Asimismo, destacamos que el carácter sui generis de la elección de una persona por nominación directa no implica que ésta pueda cumplir con los requisitos en una etapa tan posterior del proceso como lo es la certificación de elección e inminente juramentación, según concluyó el Tribunal de Apelaciones. Ello implica validar un tratamiento injustificado y distinto a los candidatos que figuraron en la papeleta. Postergar la exigencia de estos requisitos hasta el momento en que el Querellado fue certificado finalmente como delegado electo o, incluso, a la fecha en que debe juramentar y ocupar el cargo, más allá de estar en contra de toda hermenéutica jurídica, constituye un trato preferente que vulnera la ley especial y los principios de trato igualitario que deben enmarcar el Derecho Electoral. Por consiguiente, es forzoso concluir que no se sostiene jurídicamente semejante interpretación.

**En consecuencia, procede en Derecho reconocer que, como parte del trato igualitario que debe imperar en los requisitos que se les exige a los funcionarios que ocuparán**

**un cargo público, una persona electa por nominación directa tenía que cumplir los requisitos del Artículo 8 de la Ley para crear la Delegación Congresional, <u>supra</u>, el día de la elección, lo cual, en el caso de autos, ocurrió el 16 de mayo de 2021.**

**D.**

Conforme se adelantó, el Artículo 8 de la Ley para crear la Delegación Congresional, <u>supra</u>, exige que, además de satisfacer el requisito de ser residente de Puerto Rico o Washington, D.C., se cumpla con el Artículo 7.2 del Código Electoral, <u>supra</u>. Veamos, pues, qué otros requisitos impone la ley electoral a los candidatos y aquellos nominados directamente a delegados congresionales.

El Artículo 7.2 del Código Electoral, <u>supra,</u> establece una serie de requisitos que deben cumplir los aspirantes a candidaturas para cargos públicos electivos. En lo aquí atinente, se dispone que "[t]oda persona que desee figurar como aspirante o candidato a un cargo público electivo, deberá ser **Elector activo y hábil** al momento de presentar su intención". (Énfasis suplido). Íd., Art. 7.2(f). Como vimos, este requisito no se circunscribe exclusivamente a un aspirante o candidato, sino que también se extiende a toda persona que resulte electa mediante nominación directa. Por consiguiente, según el Artículo 2.3(9) del Código Electoral, <u>supra</u>, un elector activo y hábil será:

> Todo ciudadano que cumpla con los requisitos dispuestos en esta Ley para figurar en el Registro General de

> Electores de Puerto Rico y para votar. Como mínimo, deberá ser ciudadano de Estados Unidos de América, haber cumplido por lo menos dieciocho (18) años de edad en o antes del día de la votación dispuesta por ley **y, cumplir con los requisitos de domicilio electoral en Puerto Rico dispuestos en esta Ley**. (Énfasis suplido). Íd.

Claramente, ser un elector activo y hábil exige, entre otros requisitos, que éste se encuentre domiciliado electoralmente en Puerto Rico. En consecuencia, resulta menester examinar qué ordena el Código Electoral sobre el domicilio electoral. A esos efectos, el Artículo 5.4 del Código Electoral, _supra_, dispone que:

> (1) Para propósitos electorales, es la última dirección de vivienda, morada o casa de alojamiento informada por el Elector en el Registro General de Electorales en torno a la cual **el Elector afirma que giran o girarán sus intereses personales, actividades habituales, y regulares, como persona natural y las de su núcleo familiar**, si lo tuviera; **y donde esas actividades personales o familiares se manifiestan con evidentes actos de su intención de allí estar o permanecer indefinidamente después de allí mudarse o después de ausencia temporera.**
>
> . . .
>
> (Énfasis suplido). Íd.

Ahora bien, en el pasado, los términos "residencia" y "domicilio" han sido confundidos y, en consecuencia, utilizados como sinónimos. _Fiddler v. Srio. de Hacienda_, 85 DPR 316, 321-322 (1962). Esta confusión en el lenguaje popular ha trascendido al ámbito legal, a pesar de que ambos conceptos son jurídicamente distinguibles.

No obstante, desde P.P.D. v. Admor. Gen. de Elecciones, 111 DPR 199 (1981), analizamos las disposiciones de la ley electoral allí vigente y advertimos la diferencia entre los términos residencia y domicilio.[15] Lo anterior, con el propósito de resaltar la dicotomía existente en la ley electoral, la cual erróneamente suponía que "el domicilio es donde la persona reside, un lugar específico identificable mediante una precisa dirección por calle y número de casa, nombre de urbanización o barrio, etc.". Íd., pág. 249. Además, advertimos que "tal suposición no cuadra ni con el concepto jurídicamente aceptado en Puerto Rico de lo que es el domicilio de una persona. . .". Íd. Por tanto, hemos reiterado que:

> [U]na persona que tenga su domicilio establecido allí donde reside, podría mudarse a residir a otro lugar y con ello no perder el domicilio en el primer lugar hasta que, unido al acto de residir en el segundo sitio, exista la intención de allí permanecer, que es cuando adquiriría domicilio en el segundo lugar. Íd., pág. 250.

Del precepto citado se desprende que "una persona puede estar domiciliada en un lugar donde no resida. . .", puesto que residir en determinado lugar no es sinónimo con estar domiciliado electoralmente en tal lugar. Íd. En cambio, el término residente implica la acción y el efecto de vivir o estar presente en un lugar en particular. De ahí el axioma

---

[15]Según el Código Civil de Puerto Rico, Ley Núm. 55-2020, el término residencia es definido como "el lugar en que vive una persona, tenga o no la intención de establecer allí su domicilio". Íd., Art. 31.

de que "[u]na persona natural puede tener varias residencias, pero sólo un domicilio". Fiddler v. Srio. de Hacienda, supra, pág. 322. (citas internas omitidas). Dicho de otro modo, en el contexto electoral, hemos sido consistentes en que se puede ser domiciliado de un lugar sin tener presencia física en él debido a la diferencia que presupone cada uno de los términos.

En ese sentido, exigir el cumplimiento de los requisitos de residencia y domicilio no es de nuevo cuño en nuestro ordenamiento electoral. Como cuestión de hecho, diversos puestos electivos exigen que se satisfagan ambos requisitos como condición para la validez de la candidatura. Así, por ejemplo, para el cargo de alcalde, el Artículo 1.011 del Código Municipal de Puerto Rico, supra, requiere que éste esté domiciliado en el municipio al menos un (1) año antes de la elección y, a su vez, que sea elector cualificado del municipio, lo que implica que resida en él. Asimismo, en el contexto de los miembros de la Asamblea Legislativa, es harto conocido que, a pesar de que se exige exclusivamente que la persona "haya residido en Puerto Rico por lo menos durante [...] dos años", también les es requerido que estén domiciliados electoralmente en la Isla como requisito previo a oficializar su candidatura. Art. III, Secc. 5, Const. PR, supra. Dicho de otro modo, no basta con el requisito de residencia, sino que, también se debe satisfacer el requisito de domicilio electoral.

Como cuestión de Derecho, cortes estatales en jurisdicciones de los Estados Unidos no sólo han validado el doble requisito de residencia y domicilio, sino que también han interpretado que el cumplimiento con ambos es imperativo para cualificar como un candidato. A modo de ejemplo, el Tribunal Supremo de Nevada ha afirmado en dos (2) ocasiones que, cuando el estatuto requiere la "residencia real" en el lugar como requisito para un cargo público, en realidad exige el cumplimiento dual de residencia y de domicilio legal. Entiéndase, el aspirante debe demostrar ambos para una candidatura legítima. Esto, pues, "[b]y requiring actual residence as well as legal domicile, [el estatuto] focuses on the one place where a person is **located and intends to remain permanently**". Williams v. Clark Cty. Dist. Att'y, 118 Nev. 473, 483, 50 P.3d 536, 542 (2002), as corrected (July 26, 2002). Véase, además, Chachas v. Miller, 120 Nev. 51, 83 P.3d 827 (2004).

Asimismo, la constitución de Luisiana expresamente exige que los candidatos a la legislatura estatal residan por cierto tiempo en el estado y, además, estén realmente domiciliados en el distrito que desean representar.[16] Según lo han interpretado las propias cortes del estado, su propósito está arraigado en el interés de "eliminate a system under which candidates would establish a 'political domicile' from which to seek office even though they chose to live and

_____

[16]LA. CONST. ANN. art. III, sec. 4(A).

maintain their families in another area, and were not truly representative of the district from which they sought election".[17] Por consiguiente, se requiere, en primer lugar, que se demuestre la residencia, la cual debe ser cierta, no pretendida o fraudulenta.[18] En segundo lugar, debe probarse el domicilio.[19] En consecuencia, un aspirante a la candidatura debe ser un residente habitual y, además, estar presente físicamente y establecido de forma principal en el lugar.[20]

**Es de notarse que un estatuto que exija tanto el requisito de residencia como el de domicilio electoral presupone que no basta con que se cumpla con uno o con el otro; debe cumplirse con ambos. Una interpretación coherente exige el hecho objetivo de presencia física en determinado lugar y, además, el hecho subjetivo de domicilio con respecto**

---

[17]Mix v. Blanchard, 318 So. 2d 125, 129 (La. Ct. App. 4 Cir. 1975).

[18]McIntire v. Carpenter, 202 So. 2d 297 (La. Ct. App. 4 Cir. 1967); Daley v. Morial, 205 So. 2d 213 (La. Ct. App. 4 Cir. 1967); Slocum v. DeWitt, 374 So. 2d 755, 758 (La. Ct. App. 3 Cir. 1979).

[19]Charbonnet v. Hayes, 318 So. 2d 917, 919 (La. Ct. App. 4 Cir. 1975). En tal caso, la corte reconoció que, en su estado anterior, la provisión constitucional sólo requería la residencia real, por lo cual "[t]he substitution of the word 'domiciled' for 'resident' effects a considerable change in the requirements of candidacy". Por consiguiente, "the constitution requires adherence to the factual concept of habitual residence and principal establishment, and, where a person resides alternately in several places, he is only qualified for election purposes in that place where he maintains bona fide living quarters in which he actually lives a substantial part of the time". Íd.

[20]N. A. Davrados, Louisiana My Home Sweet Home: Decodifying Domicile, 64 Loy. L. Rev. 287, 357–59 (2018).

**al lugar en el que las actividades personales o familiares se manifiestan con evidentes actos de su intención de estar o permanecer allí indefinidamente.**

Por tanto, es válida constitucionalmente la exigencia dual del requisito de residencia y domicilio en aras de salvaguardar la adecuada representatividad electoral.

Examinado el Derecho, procedo a aplicarlo a la controversia que nos ocupa y exponer las razones de mi disenso.

**IV**

Conforme se relató, la controversia de autos surgió luego de que el exgobernador Rosselló Nevares resultara electo como delegado congresional en la elección especial celebrada el pasado 16 de mayo de 2021. Eventualmente, su elección fue impugnada por el Comisionado del PD bajo los fundamentos de que el Querellado incumplió con dos (2) de los requisitos exigidos en el Artículo 8 de la Ley para crear la Delegación Congresional, supra, a saber: ser residente de Puerto Rico o Washington, D.C., y estar domiciliado electoralmente en Puerto Rico.

En respuesta, el Querellado compareció y expuso que los requisitos del Artículo 8 de la Ley para crear la Delegación Congresional, supra, aplican exclusivamente a los **candidatos** y, por no haber sido candidato, sino elegido por nominación directa, no estaba obligado a cumplir con ellos. No obstante, arguyó que, de exigírseles, estos debían ser satisfechos al momento de juramentar al cargo, a saber:

el 1 de julio de 2021. En consecuencia, solicitó que se declarara sin lugar la impugnación, ya que siempre ha estado domiciliado electoralmente en Puerto Rico y, además, desde el 1 de junio de 2021, alquiló una residencia en Washington, D.C.

Trabada así la controversia, se celebró una vista evidenciaria que contó con el testimonio del exgobernador Rosselló Nevares y, posteriormente, el Tribunal de Primera Instancia dictó Sentencia. El foro primario, correctamente, aplicó por igual los requisitos de un candidato a una persona elegida por nominación directa; precisó que tales requisitos debían cumplirse al 16 de mayo de 2021, fecha de la elección especial; concluyó que, de la prueba presentada y del testimonio del Querellado, resultaba claro que éste, al 16 de mayo de 2021, incumplió con los requisitos de residencia y domicilio y, por consiguiente, declaró con lugar la impugnación y descalificó al exgobernador Rosselló Nevares del cargo de delegado congresional.

Inconforme, la Comisionada del Partido Nuevo Progresista acudió al Tribunal de Apelaciones y allí esbozó planteamientos similares a los ya planteados ante el foro primario. Así las cosas, el 8 de julio de 2021, el Tribunal de Apelaciones emitió un dictamen mediante el cual, erróneamente, concluyó que el Tribunal de Primera Instancia no tenía jurisdicción para descalificar a un candidato que no había sido certificado de forma final. A su vez, descartó

que el Comisionado del PD ostentara la legitimación activa para impugnar la elección del Querellado.

En desacuerdo, el Comisionado del Partido Popular Democrático acude ante este Tribunal y nos solicita que revoquemos el dictamen del Tribunal de Apelaciones. En suma, expresa que, contrario a lo que concluyó el foro apelativo intermedio, no existe un impedimento jurisdiccional para que atendamos la controversia en los méritos.

Ahora bien, habida cuenta de que, contrario a lo determinado por el Tribunal de Apelaciones, sí existe jurisdicción en esta etapa para atender la controversia, reiteramos que el foro apelativo intermedio erró. Como señalamos bajo el Acápite III(A), la conclusión de que, es necesario que la CEE emita un certificado de elección como condición previa para la descalificación de un delegado es, como mínimo, improcedente. Según discutimos en los Acápites III(B) y III(C), tanto los candidatos que figuraron en la papeleta electoral como quien fue electo por nominación directa, deben cumplir con los requisitos **antes** de que la CEE emita tal certificación. Así lo dispone diáfanamente el Artículo 8 de la Ley para crear la Delegación Congresional, supra, y, ello, además, es cónsono con el Artículo 7.5 del Código Electoral, el cual regula lo referente a la descalificación de candidatos. Esto, particularmente, debe ocurrir **previo a la elección** y, en el caso particular de una **persona electa por nominación directa**, según precisamos, **el mismo día de la elección**. Por tanto, es

errónea la conclusión del Tribunal de Apelaciones a los efectos de que ningún delegado congresional electo puede ser impugnado hasta tanto la CEE emita un certificado de elección.

No obstante, aun si para fines argumentativos concluyéramos que aplica el Artículo 10.15 del Código Electoral, supra, lo cual negamos, sería un contrasentido que un Comisionado Electoral tenga que cruzarse de brazos y esperar a que se juramente al funcionario electo por nominación directa que incumple de forma patente con los requisitos, sin poder recurrir a cuestionar la validez legal de ese acto previo a que se consuma. No podemos obviar que, como componentes esenciales de la CEE, los comisionados electorales tienen el deber de "cumplir y hacer cumplir las disposiciones y los propósitos de esta Ley". Artículo 3.2(1) del Código Electoral, supra.

La interpretación realizada por el Tribunal de Apelaciones delega exclusivamente en "otro candidato" aspectos medulares de los deberes ministeriales de los comisionados electorales, privándolos de recurrir al foro judicial para descargar la tarea de velar por la pureza de los procesos electorales y el cabal cumplimiento de los requisitos dispuestos en ley. Aparte del error de no reconocer que el Artículo 8 de la Ley para crear la Delegación Congresional, supra, no restringe la legitimación para cuestionar el cumplimiento de los requisitos por parte de una persona electa por nominación

directa, es un error aplicar con un automatismo extremo el andamiaje que opera en las elecciones generales.[21] Ello, con la consecuencia de privar de jurisdicción al Tribunal de Primera Instancia en esta controversia novel y particular.

Resulta errado aplicar tal esquema a la nominación directa porque tanto las leyes electorales anteriores como la vigente están predicadas en la premisa de que los partidos y la CEE, previo a la elección, calificaron a los candidatos que figuran en la papeleta, lo cual es correcto respecto a los candidatos, pero no así en el caso de las personas que son electas bajo nominación directa. Ello, con el agravante de que, una vez juramentado el funcionario, existen consecuencias jurídicas distintas en torno a su sustitución, si eventualmente el foro judicial confirmara la invalidez del juramento.

En ese ese sentido, en el caso de los candidatos que fueron previamente evaluados y calificados, una vez concluye la fase de la elección, la responsabilidad administrativa de la CEE para conceder certificados de elección no es tan profunda, habida cuenta de que ya transcurrió una serie de filtros que permiten inferir que la persona cumple con los requisitos en ley. Así lo refleja

---

[21]Lo anterior, máxime cuando el Artículo 13.1(1) del Código Electoral, _supra_, expresamente dispone que **los comisionados electorales "tendrán legitimación activa a nivel judicial para intervenir en cualquier asunto con 'naturaleza específicamente electoral' que esté o haya estado bajo la jurisdicción de la Comisión. . .".** (Énfasis suplido). Íd.

la certificación emitida por la CEE el 1 de junio de 2021, la cual, a quien figuró como candidato en la elección especial, le exigió exclusivamente el cumplimiento del Artículo 10.11 del Código Electoral, supra.[22]

Por el contrario, muy distinto es el caso de una persona electa por nominación directa, máxime cuando en nuestra jurisdicción no hay obligación de presentar previamente un formulario y cumplir con procedimientos para garantizar que, una vez electa, la persona cumple con los requisitos dispuestos en el ordenamiento para determinada posición electiva. Igualmente, así lo refleja la certificación de la CEE, la que, como expresamos, exige que la persona electa por nominación directa cumpla con el Artículo 8 de la Ley para crear la Delegación Congresional, supra, y con los Artículos 7.2 y 10.11 del Código Electoral, supra.[23]

Ante esa realidad, sostener la Sentencia recurrida conlleva al absurdo de que los funcionarios electorales tengan que certificar a ciegas a una persona que no necesariamente cumple con requisitos sustantivos básicos para ejercer el cargo y con el agravante de que, posteriormente, éstos no tengan legitimación activa para cuestionarlo. **Esta interpretación textualista extrema se**

---

[22]Véase, Apéndice de certiorari, Apelación de Sentencia del 2 de julio de 2021, Certificación, págs. 267-268.

[23]Íd.

**aleja de los propósitos de la pureza electoral, conlleva suprimir deberes ministeriales de los componentes de la CEE y nos conduce al absurdo de que si candidatos inverosímiles como, por ejemplo, Mickey Mouse o un menor de quince (15) años, obtuvieran la primera posición por nominación directa en una elección, la CEE tendría que irresponsablemente certificarlos y nadie más podría cuestionarlo, con excepción de "otro candidato".**

El Código Electoral vigente ciertamente no pudo prever la posibilidad de que una persona fuera electa por nominación directa, por lo que no contempla el sistema de filtros y calificación previo a la elección que se impone al resto de los candidatos. Ante esa laguna, tenemos que impartir una interpretación razonable y armoniosa, de tal forma que no se produzca un resultado absurdo o contrario a la intención o propósito primordial de garantizar la pureza de los procesos electorales. PNP v. Comité PNP Gurabo I, 197 DPR 541, 542 (2017) (Estrella Martínez, J., Voto particular disidente); Rosado Molina v. ELA y otros, 195 DPR 581 (2016); IFCO Recycling v. Aut. Desp. Sólidos, 184 DPR 712, 740 (2012).

Ante ese cuadro, el razonamiento del foro recurrido, así avalado implícitamente por una mayoría de una Sala Especial de Verano de este Tribunal, sencillamente efectúa una interpretación que se aleja de la Ley para crear la Delegación Congresional, supra, y que limita indebidamente el ámbito administrativo de la CEE y la jurisdicción de los

tribunales para proveer un remedio adecuado, completo y oportuno. Lo anterior, a pesar de que existe una interpretación más armoniosa y compatible con el Derecho Electoral. Con este proceder, no se protegió el interés público ni los derechos de los electores que votaron por candidatos que cumplían con la totalidad de los requisitos al momento de la elección.

**Por tanto, procedía que el Tribunal de Apelaciones concluyera que la controversia sí estaba madura, y, en consecuencia, analizara si el exgobernador Rosselló Nevares cumplió con el requisito de ser residente de Puerto Rico o Washington, D.C, al momento de la elección. Adelantamos que no. Veamos.**

En este caso, no está en disputa que el Querellado reside en Virginia desde el 2019 y que, desde entonces, no ha regresado a Puerto Rico.[24] En consideración a lo anterior, hay que descartar la posibilidad de que éste haya cumplido con el requisito de residencia por razón de que no ha tenido presencia física en Puerto Rico. Por consiguiente, se debe auscultar si, al 16 de mayo de 2021, fecha de la elección especial, el Querellado residía en Washington, D.C.

Según surge de las determinaciones del Tribunal de Primera Instancia, "[p]ara la fecha de la elección especial de delegados al Congreso, 16 de mayo de 2021, el querellado

---

[24]Véase, Apéndice de certiorari, Sentencia, Determinaciones de hechos número ocho (8) y nueve (9) pág. 238.

tampoco residía en Washington. Según su testimonio "'no tenía donde quedarse en Washington'".[25] **Es decir, al 16 de mayo de 2021, fecha de la elección especial, el Querellado no tenía presencia física en Puerto Rico ni en Washington, D.C.**[26] Esto, pues, según la prueba desfilada en la vista evidenciaria celebrada el 28 de junio de 2021, el Querellado residía y se encontraba físicamente en Virginia al momento en que se celebró la elección especial en Puerto Rico.[27]

Ahora bien, el Querellado testificó que el 1 de junio de 2021, alquiló una residencia en Washington, D.C.[28] No obstante, según se explicó, tal fecha no es la determinante para satisfacer el requisito. Conforme se estableció en el Acápite II(B), es improcedente brindar un trato dispar o más favorable a un delegado electo que figuró como un candidato vis a vis un delegado electo por nominación directa, **o viceversa.** Por tanto, el delegado electo por nominación directa, igualmente, venía obligado a cumplir con tales requisitos al momento de la elección.

A los delegados que figuraron en la papeleta se les exigió que, como condición para ser certificados como

---

[25]Véase, Apéndice de certiorari, Sentencia, Determinación de hecho número cuarenta y uno (41), pág. 240.

[26]Íd., Determinaciones de hechos número cuarenta y tres (43) y cuarenta y cuatro (44).

[27]Íd., Determinación de hecho número cuarenta y cinco (45).

[28]Íd., Determinación de hecho número cuarenta y dos (42).

**candidatos**, cumplieran con todos los requisitos del Artículo 8 de la Ley para crear la Delegación Congresional, supra. Esto incluyó ser residentes de Puerto Rico o Washington, D.C. No obstante, la elección de un delegado por nominación directa no implica que éste pueda satisfacer tardíamente los requisitos al momento de jurar al cargo, según planteó el Querellado. Tampoco luego de que la CEE emitiera el certificado de elección, tal y como concluyó el Tribunal de Apelaciones. En cambio, y según se precisó en el Acápite II(C), en el caso de un funcionario electo por nominación directa, éste debe satisfacer los requisitos al momento de la elección, a saber: el 16 de mayo de 2021. Ello, pues, como cuestión de hermenéutica jurídica y a tenor con lo resuelto por este Tribunal en Tonos Florenzán v. Bernazard, supra, no se justifica el cumplimiento de los requisitos en un momento posterior.

Como se aprecia, el requisito de residencia no puede tratarse como uno proforma, sino que, más bien, constituye un ingrediente de carácter sustantivo que impide que candidatos potenciales, aun si cumplieran con los otros requisitos que impone el Artículo 8 de la Ley para crear la Delegación Congresional, supra, sean inelegibles para ocupar el cargo electoral si no son residentes de Puerto Rico o Washington, D.C. Esto, máxime, cuando no existe duda de la validez de los requisitos de residencia y domicilio que se establecen regularmente a cualquier persona que

potencialmente ocupará un cargo en el servicio público.[29] Ello, sobre todo, cuando, como discutimos, la exigencia dual de residencia y domicilio es germana con otras disposiciones que establecen requisitos sustantivos para la ocupación de un cargo en el servicio público.

En fin, reafirmo que, en primer lugar, el Tribunal de Primera Instancia contaba con la jurisdicción para atender los méritos de la controversia y descalificar al exgobernador Rosselló Nevares como candidato electo al puesto de delegado congresional. En segundo lugar, procedía confirmar la descalificación del Querellado por no reunir los requisitos dispuestos por el Artículo 8 de la Ley para crear la Delegación Congresional, supra. La controversia aquí planteada exigía que este Tribunal así lo declarara. Toda vez que una mayoría de una Sala Especial de Verano de este Tribunal optó por tomar una ruta contraria a la que requería la fiel aplicación del Derecho y, con ello, implícitamente avaló el criterio desacertado del Tribunal de Apelaciones, disiento.

**V**

**Nuestro ordenamiento jurídico electoral exige que se brinde un trato igualitario en cuanto a los requisitos que deben cumplirse para ocupar un cargo público, sin distinción de la forma en que la persona fue electa. En este caso, ello sólo se lograría con una interpretación armoniosa y**

---

[29]Véase, Acápite II(D).

**razonable que no sea contraria ni menoscabe la intención y el texto de la ley. Al no adoptarse este curso de acción, el pilar del trato igualitario que sostiene al Derecho Electoral ha sido socavado al permitir un tratamiento preferente y desigual en esta controversia.**

Por todo lo anterior, hubiese expedido el recurso de certiorari ante nuestra consideración, revocado al Tribunal de Apelaciones y, en su lugar, confirmado el dictamen del Tribunal de Primera Instancia.

Luis F. Estrella Martínez
Juez Asociado